### THE INTERSTATE NO. 1.

(Circuit Court of Appeals, Second Circuit. April 16, 1923.)

No. 195.

1. **Towage ⚜16—Liens for repairs and supplies take precedence of liens for negligent towage.**

Liens for repairs and supplies are superior in rank to liens for negligent towage.

2. **Maritime liens ⚜37—Preferential liens for supplies on harbor tugs limited to one 40-day period.**

The 40-day rule, giving liens on tugs operating in New York Harbor for supplies furnished within 40 days of suit preference, involves a single preferential period of 40 days, and all claims of the same class antedating this 40-day period lose their priority right and are to be prorated.

3. **Maritime liens ⚜37—Forty-day period for priority of liens against harbor tug held properly computed from date of filing libel.**

The date of filing of a libel against a harbor tug *held* properly taken as the time from which to compute the 40-day period within which those furnishing repairs or supplies were entitled to priority of lien, though previous to that time an order in equity was in force appointing receivers for the tug owner and restraining suits against it, where on application for leave to file the libel was granted by the court of equity, and there had been no previous application for such leave.

4. **Maritime liens ⚜37—Rule of priority between liens of same class.**

There are three rules in admiralty respecting priority of liens of the same class: (1) In case of vessels engaged in commerce on the ocean, the voyage rule is applied, and liens for necessaries furnished on the last voyage rank similar liens for prior voyages; (2) in case of vessels engaged in commerce on the Great Lakes or canals, the season rule applies, and liens of the last season rank similar liens for a prior season;

⚜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and (3) in case of harbor vessels on the Atlantic coast, claims less than 40 days old rank older ones in lien.

**5. Maritime liens ⬤⟹37—Forty-day rule for harbor vessels approved.**

The reasons which induced the adoption of the rule of The Gratitude, 42 Fed. 299, giving priority of lien on harbor tugs to claims arising within the last 40 days, which rule has been followed in relation to New York Harbor since 1890, are still applicable, and the rule will be adhered to without extension of the 40-day period.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by James Shewan & Sons, Inc., and others, against the steam tug Interstate No. 1. From the decree, Burns Bros., colibelants, appeal. Affirmed.

Certiorari denied 43 Sup. Ct. 701, 67 L. Ed. ——.

It appears steam tug Interstate No. 1 was first attached under process issued upon the libel of James Shewan & Sons, Inc., to enforce a maritime lien for repairs. Under that libel the boat was sold pursuant to leave of court modifying a receivership restraining order issued by the court in an equity suit brought against the owner of the tug. It also appears that Burns Bros., Horre Coal Company, Inc., O. C. & K. R. Wilson, M. K. Bowman-Edson Company, William & Wells Company, Boat Repair Corporation, John W. Sullivan Company, Heipershausen Bros., and Low Transportation Line filed their several libels against the vessel, and that these libels were all filed to enforce maritime liens.

The vessel having been sold by the marshal under a decree of the court for $11,500, there was left a sum of $10,774.41, after deducting the fees and expenses of the marshal, which amount was applicable to the payment of the claims. This amount was insufficient to pay the claims in full. It was therefore necessary to marshal them, and determine their rank and priority, in order to have a distribution of the proceeds of sale. An application was accordingly made for an order marshaling the claims in the several suits against the vessel and determining the priority of the liens. Proofs were taken under the court's order to enable it to ascertain the amount of the liens and their respective priorities, and on April 3, 1922, the final order or decree of distribution determining priorities was entered. The order, after setting forth the maritime liens for repairs and supplies of the various libelants the dates of their accrual, and the nature of the claims and their amounts, all of which were claims for repairs or supplies, except the claim of the Low Transportation Line, which was for negligent towage and accrued on November 8, 1919, concluded as follows:

"And it appearing from the foregoing finding of fact that none of the claims for repairs or supplies enumerated accrued within 40 days from July 14, 1921, the date of the filing of the first libel of James Shewan & Sons, Inc., against the above vessel, which at the times when the claims accrued was a harbor tug, engaged in towing in the harbor of New York, and that the claim of the Low Transportation Line for negligent towage, which accrued November 8, 1919, before any of the claims for repairs or supplies, and it further appearing that the proceeds of sale of the said vessel are insufficient to pay all the claims with costs in full, it is ordered that none of the claims for repairs or supplies has any priority in rank over any of the others, but that the said claims for repairs or supplies have a rank superior to that of the claim of the Low Transportation Line for negligent towage; and it is further ordered that the clerk of this court, after paying the fees of the officers of this court, pay out of the proceeds of sale of said vessel to the proctors for the various libelants their costs and disbursements as taxed, and then distribute the balance of the proceeds of sale pro rata among the libelants for repairs and supplies in proportion to the amount of their respective claims as proved; and it is further ordered that, unless an appeal be taken within the time and in

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the manner prescribed by the rules and practice of this court, by any of the parties libelant, the clerk of the court proceed to the distribution of the proceeds of sale in the manner and form as hereinbefore provided."

From this decree appeals have been taken.

Alexander & Ash, of New York City (Mark Ash, of New York City, of counsel), for appellant Burns Bros.

Foley & Martin, of New York City (William J. Martin and George V. A. McCloskey, both of New York City, of counsel), for appellee James Shewan & Sons, Inc.

Weissberger & Leichter, of New York City (M. M. Leichter, of New York City, of counsel), for appellee William & Wells Co.

Carter & Carter, of New York City (Peter S. Carter, of New York City, of counsel), for appellee Boat Repairing Corporation.

Before ROGERS and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The steam tug Interstate No. 1 is a harbor vessel, which at the times hereinafter mentioned was engaged in towing and lightering around the port of New York, by the Interstate Lighterage & Transportation Company, her owner. Ten libels have been filed against her, or her proceeds; she having been arrested and sold. The claims as allowed amount to $28,590.87. The net proceeds, after defraying the expenses of sale of the vessel and the marshal's fees, which have been paid into the registry of the court, amount to $10,744.41.

It appears that the claim of Burns Bros. is for coal furnished to the vessel in March, April, and May, 1921, amounting, with interest, to $7,090.61. The claim of James Shewan & Sons is for repairs on the vessel, which were made in March and September, 1920, amounting to $15,053.39. The claim of the Boat Repair Corporation is also for repairs made on the vessel in October and November, 1919, and in November, 1920, and in March and April, 1921, amounting, with interest, to $930.96. The claim of John W. Sullivan Company is also for repairs, which were made in April, May, June, October, and December, 1920, amounting, with interest, to $2,118.42. The claim of Heipershausen Bros. is in like manner for repairs, made in October and November, 1920, amounting, with interest, to $1,524.62. The claim of Horre Coal Company, Inc., is for coal furnished in March and April, 1921, amounting, with interest, to $197.79. The claim of O. C. & K. R. Wilson is for supplies furnished in October, 1920, and in March, April, and May, 1921, amounting to $114.98. The claim of M. K. Bowman-Edson Company is for supplies furnished in October, November, and December, 1920, and in March and May, 1921, amounting, with interest, to $134.68. The claim of William & Wells Company is also for supplies, furnished in December, 1920, amounting to $378.55. The claim of the Low Transportation Line is for negligent towage in November, 1919, amounting to $1,161.85.

[1] In the case of The Gratitude, 42 Fed. 299, Judge Brown held that liens for supplies take precedence of a lien for damage to cargo on the same voyage and similarly to damage arising from negligent

towage on the same voyage. Referring to the general maritime law he said:

"By this law, as applied everywhere and without exception since the Ordinance of Louis XIV, more than two centuries ago, supply liens have been held to be superior in rank to liens for damage to cargo on the same voyage, wherever such liens have been recognized at all. By similitude they are therefore superior to towage damage."

That part of the decree in the case now before the court which postpones the claim for negligent towage to the liens for repairs and supplies is not challenged on this appeal. The law on that subject seems now so well established as to be beyond controversy.

[2] But in the instant case it was necessary to determine whether any of the claims for repairs or supplies has priority in rank over any of the other claims for repairs or supplies. In disposing of that question the court also relied upon The Gratitude, supra. In that case, which was decided in 1890, ten libels had been filed against the tug. Two of the libels were for coal furnished the tug, one was for negligent towage, two were for wages, and the rest were for materials, repairs, supplies and labor. Most of the claims were over a year old. The rule declared was that liens for supplies furnished to harbor tugs making short trips about New York Harbor should lose their priority after 40 days. It was pointed out that by the general maritime law the priority of liens continues only until the next voyage. The liens connected with every new voyage start with a priority over all former ones after the ship has sailed, if there has previously been an opportunity to enforce them. Judge Brown declared that, if the general maritime rule were to be applied literally to the daily or hourly trips of harbor tugs, treating such trips as voyages, liens on them would be practically disallowed altogether, as business could not be carried on by daily libels. He then said:

"I think the time allowed for retaining priority in these harbor cases may be justly reduced to 40 days. That will give the short credit incident to the usual rendering of monthly bills, and 10 days more for settlement, or libeling the boat in case of nonpayment. It accords in some degree with the period of modern Atlantic voyages, it does not exceed the time ordinarily enjoyed by the ship in the ante-steam period, and it is short enough not to imperil, as a rule, the security, or the partial security afforded to damage claims, which the maritime law designs also to protect, though subordinately to contract liens on the same voyage, according to the universal practice (except under peculiar circumstances) of at least the last 200 years. The long extension of time heretofore given has led to evils and abuses here, which observation satisfies me ought to be corrected by a nearer approach to the general maritime rule; and the time limit of 40 days, after which such liens will be held to lose their priority as regards any liens arising on a subsequent voyage or trip, will, I think, subserve all that necessity and that encouragement of commerce for which maritime liens have been created, and for which they are preserved; and that time will not ordinarily or substantially prejudice damage liens, which are of a lower rank, beyond that inferiority which for centuries has been assigned to them as nonbeneficial liens. The time limit is, indeed, an arbitrary limit; and so is the season limit, or any other limit that can be adopted for harbor tugs consistently with the existence of such liens at all for any practical use. Any other rule than the voyage rule must be arbitrary, and that rule would leave no practical security whatever."

290 F.—59

It was, however, argued in the instant case that, when numerous libels are filed against the same vessel and she is sold and her proceeds are paid into court, and it appears, as it does in this case, that the claims in suit against her have arisen over many months or several years, then the whole period through which the liens arose is to be divided into successive 40-day periods, and (as between claims of the same rank) priorities awarded, in the inverse order of date, to each batch of claims for each 40-day period. The court below declined to adopt the theory thus advanced. In rejecting it the court declared that an examination of the record in The Gratitude case showed that the claims (of the same class) accruing within 40 days of the filing of the first libel were paid in full, and all the rest were prorated as of equal rank, although some of them were much closer to the 40-day period than others. An examination of the record in that case makes it plain that no more than one 40-day period was recognized. And in the instant case the court below simply adhered exactly to the course which Judge Brown adopted in The Gratitude. Whether in doing so he committed an error must now be determined.

The learned counsel for the appellant Burns insists that the general maritime rule that liens of the same class arising on a later voyage are preferred to those arising on a prior voyage is applicable to adjusting liens on New York Harbor craft measured out in successive periods in analogy to voyages, so that those accruing in later periods shall outrank those in earlier periods. In his opinion the court below fell into a grievous error in holding that the 40-day rule contemplates but one preferential period of 40 days, and that all older claims fall into the general class of unpreferred liens, unless so old as to be unenforceable as liens. In support of this contention he called our attention to a passage from the opinion in The Glen Island (D. C.) 194 Fed. 744, 746, which he claims supports his argument. It happens that the opinion in that case was written by the same judge who decided this case in the court below. In the argument in the lower court the passage was called to his attention and is referred to in his opinion. He disposed of it by saying that if anything in that opinion "be thought to support it [the counsel's contention] my words were chosen most unfortunately."

Our attention is also called to the language used by the District Judge in Matter of New England Transportation Co., 220 Fed. 203, 208 where it was said that the 40-day rule laid down in The Gratitude "intended successive 40-day periods." But what was said on that subject was merely obiter, as the case was one to which the judge said the 40-day rule, however understood, did not apply. The Leonard F. Richard, 231 Fed. 1002, decided in the Eastern District of New York is also cited as supporting counsel's contention. It is said that in that case Judge Chatfield, considering whether "as a matter of principle the time should be divided backward from the date of process into 40-day periods," gave priority over earlier liens to a claim which accrued "within the first and second 40-day periods." But an examination of that case shows that the libelant's claim was the only one within the 40-day period, and that the other claims dated back from

19 to 26 months and were prorated. In the Frank Richard & Gardner Co. v. The Steamer Marion, also in the Eastern District of New York, Judge Garvin, after extended argument in support of a motion that claims should be marshaled in 40-day zones until the fund was exhausted, denied the application and indorsed upon the notice of motion the following:

"The so-called 40-day rule will be followed herein to the extent of allowing one such period of preference. All such claims prior to such 40-day period must be classed alike, irrespective of when they arose."

That order was made on June 14, 1918, and the case is unreported. We think the cases including The Gratitude show that in the Southern and Eastern districts of New York the understanding uniformly has been that the 40-day rule involves a single preferential period of 40 days, and that all claims of the same class antedating this 40-day period lose their priority and are to be prorated. In the more than 30 years which have elapsed since the rule was first applied, the admiralty bar in this circuit have acquiesced therein, and it has never before been challenged in this court. It ought not now to be overthrown, unless upon very good and sufficient reasons. That the 40-day rule involves a single preferential period is as old as the rule itself, and no adequate reason is known to us which justifies this court in setting it aside.

The rule we have been discussing is understood by the shipbuilders and repairers to be in force in and about New York, although an attempt to show the contrary was made in the court below. The auditor and assistant manager of the largest dry dock concern in the port of New York, which maintains ten dry docks and repairs harbor craft and ocean-going vessels, testified as follows:

"Q. Regarding this 40-day rule, have you heard something of the 40-day rule? A. Yes, sir.

"Q. Did you ever hear of any rule providing for the making of preference based on the successive periods of 40 days? A. No, sir; I have not.

"Q. But you do know about the rule providing for preference in the inverse order of the arising of the claim? A. Yes, sir.

"Q. And tell me, please, what you understand by that rule? A. All work contracted for 40 days prior to the libeling of the vessel has a priority.

"Q. And have you ever heard of any priority at all in the matter of repairs and supplies beyond that first 40-day period? A. No, sir; I have not.

"Q. Do you know whether there is any such rule plan at all in the dry-docking business in this city? A. I know there is not.

"Q. In the making of your repairs to vessels, Mr. Cassidy, do you know whether or not there is any distinction between boats that just operate about the bay and about New York City and the class of boats than, run, say, up the North River to Albany, the East River and the Sound up to Connecticut, the Kills or around Staten Island, or are they all classed as harbor craft in the carrying on of your work? A. They are all classed as harbor craft.

"Q. And this 40-day rule that you have spoken of, do you know whether or not that is usually applied to that class of vessel? A. That is what it is.

"Q. And this lack or absence of any credit period or credit arrangements, is that usually applied to that class of vessels? A. Yes, sir; it is."

On cross-examination he testified as follows:

"Q. Tell me what you understand by the 40-day rule? A. My interpretation of the 40-day rule—

"Q. No, not your interpretation, but what do you understand it to be? A. All claims contracted for 40 days prior to the libeling of the vessel is a priority—has a priority.

"Q. What about the claim 41 days old; has that a priority over the claim for 80 days? A. Has absolutely no bearing on the 40-day rule.

"Q. Irrespective of the 40-day or any other rule, do you understand that a claim that was 41 days old would have priority over a claim 80 days old? A. No, sir."

Similar testimony was also given by a representative of a New York concern engaged for 20 years in the ship-chandlery and ship-supply business. His testimony was as follows:

"Q. Regarding what has been spoken of here as a 40-day rule, have you heard of that before? A. Yes, sir; I have.

"Q. What do you understand it to be? A. That goods furnished to a steamer 40 days prior to the day she is libeled will have a preference over those of other people with bills prior to that.

"Q. That is, goods supplied in the last 40 days take precedence over the previous period? A. Yes, sir.

"Q. Did you ever hear of any claim being made before to-day of there being successive 40-day periods? A. Never did."

The general manager of a concern of 20 years' standing engaged in the business of towing in New York Harbor also testified as follows:

"Q. Now, then, you have heard witnesses here to-day speak of this 40-day rule that has been mentioned; you have heard of that, have you? A. I have heard of it; yes.

"Q. And have you ever heard of any rule that provided for successive stages of 40 days with reference to the establishment of priorities and liens? A. Never.

"Q. It has been stated here by several witnesses, in your hearing, this morning, that they knew of the 40-day rule providing for the priority over debts occurring in 40 days prior to the libeling of a vessel. Have you ever heard of any rule anywhere to the effect that creditors having claims arising in subsequent blocks of 40 days, or working inversely, would be entitled to a preference based on each 40-day period? A. I have never heard of that."

[3] The court below held that the 40-day period began to run from July 14, 1921, that being the date when the first libel in this case, Shewan's, was filed. It is alleged that this was error, and that the 40-day period should begin to run from May 17, 1921, inasmuch as on that day a bill in equity was filed against the owner of the tug Interstate No. 1, and on the same day receivers were appointed and an injunction order was entered, which enjoined all persons "from doing any act whatsoever to interfere with the possession and management by said receivers of the properties of the defendant," and enjoined creditors from instituting suits "at law or in equity" against the defendants, and "from levying any attachments, executions, or other process upon or against any of the properties of said defendant." No doubt this order operated to prevent the filing of any libels in admiralty against the tug Interstate No. 1 without first applying for and obtaining the consent of the court. But no such application was made or granted, and all the maritime lienors acquiesced in a waiting policy until it appeared that there was no reasonable hope of rehabilitating the general business of the owners of the vessel. Shewan & Sons then applied to the court for permission to file its libel, which was granted, and the libel was filed on July 14, 1921. It was the first

libel filed, and the court below held that, in the absence of any other evidence than the court's records disclosed, all times of limitation or measures of staleness should start from that date. Actual seizure of the tug was made on July 18, 1921, and there was no lien arising between the filing of the libel and the time of seizure. Whatever conclusions this court may reach on the question of the length of the priority period, we think no error was committed in holding that the period began to run from the date of the filing of the first libel.

The appellant insists that there could be no laches on its part while the order appointing the receivers restrained the institution of suit. The order appointing receivers was in the usual form of such orders staying suits, and in that class of cases leave to libel is usually granted upon application. Had such an application been made by appellant Burns Bros., there might be reason for contending, even though the application was denied, that the application should be deemed equivalent to the filing of a libel for the purpose of fixing priorities. But in the absence of such an application the ordinary rule applies, and the date of the first libel filed is the date from which the 40-day period of priorities is to be reckoned. While the order appointing the receivers and restraining the institution of suit was still in force, James Shewan & Sons, Inc., applied for a modification of the order and for permission to file its libel, and its application was granted. In making its application Shewan's Sons, Inc., showed diligence. In its failure to make earlier application for like permission, Burns Bros. failed to show diligence, and must abide the consequences.

[4] This brings us to what we conceive is after all the real question in this case, which is, as previously indicated, the extent of the period of lien priority or the 40-day period as laid down in The Gratitude. It appears from the record that it was urged below that the rule when first laid down was stated by the judge who laid it down as one of convenience, was based by him on the assumption of the usual rendering of monthly bills; that 30 years had elapsed since the decision was rendered; that business habits had changed in the meanwhile, and the rule had been outgrown. It was accordingly suggested that the 40-day period ought now to be abandoned, and the period extended to one of at least 90 days. In reply to this suggestion the court said:

"I am not persuaded (1) that the 40-day rule ought to be changed to a 90-day rule, and I am convinced (2) that this court has no power to make the change. Consequently the rule of The Gratitude is not now open for modification or adoption at will in any District Court of the Second Circuit. It may not be applicable to the navigation of the Great Lakes, but where it is applicable it is no longer a rule of convenience or of equity, but it is for lower courts one of law, and in my opinion it is not properly open to change, except by the Circuit Court of Appeals."

And the able counsel for the appellant tells us that virtually the court below sent the appellant to this court to determine the binding effect of the 40-day rule at the present time, and to determine whether, in view of the record made in the present case, the rule announced in 1890 should govern present conditions and ad infinitum.

The result of the application of the 40-day rule to the liens here claimed is that none of the claims for supplies or repairs has been given

any priority in rank over any of the others, as none of them accrued within 40 days from the date of the filing of the first libel, but all of the claims for repairs or supplies have been given a rank superior to that of the Low Transportation for negligent towage. This postponement of the claim for towage we have already disposed of in an earlier part of this opinion.

It is to be observed that the question we are now considering is not when shall a claim for supplies lose its lien character having become so stale as to be unenforceable; but it is as to the period within which such a lien shall retain its preference over prior liens. It is of course elementary that general statutes of limitation are not binding on the admiralty when a question arises as to enforcing a lien existing under the maritime law. But the admiralty has its own rules on the subject, and a lien claimant must proceed with such degree of diligence as under the circumstances the admiralty law requires or he loses his priority. There are three rules governing the subject:

1. In the case of vessels engaged in commerce on the ocean, the voyage rule is applied, and liens for necessaries furnished on the last voyage rank similar liens for prior voyages. The Fanny, Fed. Cas. No. 4,638; Hatton v. The Melita, Fed. Cas. No. 6,218; The Omer, Fed. Cas. No. 10,510. Although in Massachusetts and Connecticut the calendar year has been adopted in the case of coastwise vessels. The Philomena (D. C.) 200 Fed. 873; The Bethulia (D. C.) 200 Fed. 876; In re New England Transportation Co. (D. C.) 220 Fed. 203.

2. In the case of vessels engaged in commerce on the Great Lakes and canals the season rule applies. Priorities of the last season rank similar liens for a prior season, which is practically equivalent to classifying them by the year. The City of Tawas (D. C.) 3 Fed. 170; The J. W. Tucker (D. C.) 20 Fed. 129.

3. In the case of harbor vessels on the Atlantic coast claims less than 40 days old rank older ones. The Gratitude (D. C.) 42 Fed. 299; The Samuel Morris (D. C.) 63 Fed. 736; The Glen Iris (D. C.) 78 Fed. 511; The Glen Island (D. C.) 194 Fed. 744. In the Western district of the state of Washington a period of 90 days, instead of 40, is allowed in the case of Puget Sound tugs and vessels making daily or weekly trips. The Edith (D. C.) 217 Fed. 300; The Sea Foam (D. C.) 243 Fed. 929.

[5] The rule laid down in The Gratitude was accepted without question for nearly a quarter of a century in the Southern and Eastern districts of New York. Then in 1914 a case arose in the Eastern district in which it was held that the 40-day rule did not apply to claims for wages, and in another case which arose in the same district and in the same year another judge stated that in the absence of authority he was not disposed to apply the 40-day rule to wage claims in harbor cases. The question was brought into this court on appeal in The Samuel Little, 221 Fed. 314, 137 C. C. A. 136, decided in 1915. The case was argued fully and by the same counsel on each side who argued the present appeal. The question raised was carefully considered, and in an opinion written by the present writer and concurred in by Judges Lacombe and Coxe it was said:

"That a conflict of opinion should exist on this subject in the two districts, separated from each other by the East River and having concurrent jurisdiction over New York Harbor is certainly unfortunate. Harbor liens in the harbor of New York clearly should not be determined upon one principle in the Southern district and by another in the Eastern district. This case has been brought to this court, that a uniform rule may be established and an end put to the doubt which now exists in this circuit as to what the law on this subject is.

"We are thus brought to inquire whether the 40-day rule as laid down by Judge Brown in The Gratitude, supra, is to be adhered to, or whether circumstances have so changed as to make the rule which was equitable and proper when adopted inequitable at the present time. It is our opinion that there has been no such change of conditions here as to justify a departure from the rule. The equity of the rule seems to have been accepted and conceded by all up to the present time, as is shown by the fact that the matter has never before reached this court. The rule, as we have seen, was established in the first instance because the longer extension of time which had been given to these liens had led to evils and abuses of so serious a nature that the court deemed itself justified in correcting them by shortening the time to 40 days. The change in the rule worked well, and corrected the evils incident to the former rule, and worked no prejudice to the vessels. We have looked in vain into conditions as now existing to discover what reasons there are for now departing from a principle which has so long been accepted without question, and which was originally laid down by a judge whose great knowledge of admiralty law has been for many years widely recognized, and whose wisdom concerning matters relating to maritime affairs has been conceded by all. It is as true to-day as it was when the 40-day rule was established that a longer extension of credit to the vessel would lead to abuses and evils, without any corresponding advantage to the vessels. Secret liens do not deserve encouragement. They should retain their priority for a short period of time. The reasons for a longer period, instead of becoming more cogent, have steadily become less cogent. If the 40-day rule is to be changed at all, it should be by shortening it rather than by extending it.

"It may be conceded that in some cases the rule may work a hardship in special cases. But that may be said of most rules, and perhaps of all rules. The advantage, however, of knowing in advance the exact period within which a lien can retain its priority more than compensates for any hardship which occasionally is suffered in an isolated case. It may be said that the 40-day rule simply fixed an arbitrary period. That may be true. But the same thing may be said with equal truth of the voyage rule and of the season rule. Any period of time that may be fixed upon is necessarily an arbitrary period."

We think that case is decisive of the present appeal. Nothing appears upon this appeal which leads us to think that the conclusion arrived at in that case was unsound, or that it is not controlling upon all the questions herein involved. The 40-day period was originally adopted because the long extension of time which had previously been granted in the New York Harbor cases had led to evils and abuses which needed to be corrected. In fixing the time limit at 40 days, the able and experienced admiralty judge who laid down the rule declared his belief that it subserved "all that necessity and that encouragement of commerce for which maritime liens have been created." That belief, in our opinion, has been amply justified by the results, and the rule should not now be disturbed.

Before bringing this opinion to a conclusion, attention may be called to the fact that in a recent decision in the district of New Jersey the rule laid down in The Gratitude was adopted and applied by Judge Lynch in Tietjen & Lang Dry Dock Co. v. Tug Interstate No. 2,

290 Fed. 1015, decided on January 26, 1922. After referring to the decision of Judge Brown in The Gratitude, Judge Lynch said:

"This 40-day rule was not followed in this district by Judge Green in the case of the tug Wm. C. Nicol, decided in 1896, but since that time it has been followed many times in the Southern and Eastern districts of New York, and with the approval of the Circuit Court of Appeals for the Second Circuit has come to be the established rule in those two districts. See The Samuel Little, 221 Fed. 308, 137 C. C. A. 136. The waters of New York Harbor touch not only the Southern and Eastern districts of New York, but also this district, and it seems to me that it would be extremely unwise not to have a uniform rule in the three districts with respect to New York Harbor craft. Notwithstanding the decision of Judge Green, it does seem to me that the proper thing to do now with respect to harbor craft would be to adopt the '40-day' rule and apply it to the instant case."

The matter was so fully considered by this court in The Samuel Little, supra, that we are not inclined at this time to reconsider the question. Certainly there has been no such change in existing conditions in the 7 years which have elapsed since our decision was rendered in 1915 as to convince us that the rule laid down in The Gratitude should be either set aside or modified.

Decree affirmed, with costs.